# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

_____

UNITED STATES OF AMERICA,

V.

DONE GLOBAL, INC. and
MINDFUL MENTAL WELLNESS P.A.

DEFENDANT(S).

## INDICTMENT

| FILED |
| --- |
| Dec 17 2025 |
| Mark B. Busby |
| CLERK, U.S. DISTRICT COURT |
| NORTHERN DISTRICT OF CALIFORNIA |
| SAN FRANCISCO |

_____

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this ___16th___ day of

__December, 2025__.

Clerk

Bail, $ _N/A_

Summons Issued

Hon. Thomas S. Hixson, U.S. Magistrate Judge

1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   LORINDA LARYEA (DCBN 997696)
3  Acting Chief, Fraud Section

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,           )  CASE NO.  3:25-cr-00432 VC
                                         )
13         Plaintiff,                    )  VIOLATIONS:
                                         )  21 U.S.C. § 846 – Conspiracy to Distribute
14         v.                            )  Controlled Substances;
                                         )  21 U.S.C. § 841(a) and (b)(1)(C) – Distribution of
15  DONE GLOBAL, INC. and                )  Controlled Substances;
    MINDFUL MENTAL WELLNESS P.A.,        )  18 U.S.C. § 1349 – Conspiracy to Commit Health
16                                       )  Care Fraud;
           Defendants.                   )  18 U.S.C. § 1512(k) – Conspiracy to Obstruct Justice;
17                                       )  18 U.S.C. § 2 – Aiding and Abetting;
                                         )  18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and
18                                       )  28 U.S.C. § 2461 – Forfeiture Allegation
                                         )
19                                       )  SAN FRANCISCO VENUE
                                         )
20                                       )
    _____ )
21

22                        I N D I C T M E N T

23         The Grand Jury charges:

24                        General Allegations

25         At all times relevant to this Indictment, unless otherwise specified:

26  The Controlled Substances Act

27         1.    The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801 *et*

28  *seq.*, and its implementing regulations governed the manufacture, distribution, and dispensation of

INDICTMENT                              1

FILED

Dec 17 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

controlled substances in the United States.  With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.      The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3.      A controlled substance assigned to Schedule II had a high potential for abuse, was highly addictive, and had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.  Abuse of a Schedule II controlled substance could have led to severe psychological and/or physical dependence.

4.      Pursuant to the CSA and its implementing regulations, amphetamine-dextroamphetamine was classified as a Schedule II controlled substance.  Amphetamine-dextroamphetamine was sold generically and under a variety of brand names, including Adderall.  Other stimulants, including lisdexamfetamine (sometimes sold under the brand name Vyvanse) and methylphenidate (sometimes sold under the brand name Ritalin) (collectively, "stimulants"), were classified as Schedule II controlled substances.

5.      Medical practitioners, such as nurse practitioners and physicians, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to lawfully prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States.  21 U.S.C. § 822(b); 21 C.F.R. § 1306.03.  Medical practitioners were required to register with the Drug Enforcement Administration ("DEA") in order to prescribe controlled substances.  The DEA issued registration numbers to qualifying practitioners, including nurse practitioners, which permitted them to dispense Schedule II, III, IV, and V controlled substances consistent with the terms of that registration.  21 U.S.C. § 822.  The registration of mid-level practitioners, such as nurse practitioners, was contingent upon the authority granted by the state in which they were licensed.  Upon application by the practitioner, the DEA assigned a unique registration number to each qualifying medical practitioner.  The DEA was

1    responsible for enforcement of controlled substance laws in the United States.

2         6.     The CSA required all practitioners to be registered in the state in which the patients to

3    which they were prescribing controlled substances were located, regardless of whether the prescribing

4    was taking place via telemedicine.  The CSA provided that every person who dispensed, or who

5    proposed to dispense, any controlled substance was required to obtain from DEA a registration issued in

6    accordance with DEA rules and regulations.  21 U.S.C. § 822(a)(2).  Under the CSA, such dispensing

7    included prescribing and administering controlled substances.  *Id*. § 802(10).  DEA was only permitted

8    to register a person to dispense a controlled substance if that person was permitted to do so by the

9    jurisdiction in which his or her patients were located.  *Id*. §§ 802(21), 823(f).  Thus, unless an applicable

10    exception applied, DEA regulations required a practitioner to obtain a separate DEA registration in each

11    state in which a patient to whom he or she prescribed a controlled substance was located when the

12    prescription was made, regardless of whether the prescription was made via telemedicine.  Under the

13    CSA, it was unlawful to distribute or dispense a controlled substance, unless otherwise authorized by

14    law.  21 U.S.C. § 841(a)(1).  Except in limited circumstances, Schedule II controlled substances could

15    not be dispensed without a written prescription.  21 U.S.C. § 829.

16         7.     Title 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of

17    prescriptions for controlled substances; it provided that, to be effective, a prescription for a controlled

18    substance:

19            must be issued for a legitimate medical purpose by an individual practitioner
20            acting in the usual course of his professional practice.  The responsibility
        for the proper prescribing and dispensing of controlled substances is on the
21            prescribing practitioner, but a corresponding responsibility rests with the
        pharmacist who fills the prescription.  An order purporting to be a
22            prescription issued not in the usual course of professional treatment or in
        legitimate and authorized research is not a prescription within the meaning
23            and intent of section 309 of the Act (21 U.S.C. 829) and the person
        knowingly filling such a purported prescription, as well as the person
24            issuing it, shall be subject to the penalties provided for violations of the
        provisions of law relating to controlled substances.
25

26         8.     In addition, Title 21 of the Code of Federal Regulations, Section 1306.03 required that

27    valid prescriptions for controlled substances must be issued by an "individual practitioner" who is

28    "[a]uthorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his

INDICTMENT          3

profession . . . ."

The Ryan Haight Act

9.      The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 was enacted to stem the increase in the use of controlled substances purchased on the Internet.  The Act mandated, with limited exceptions, that the dispensing of a controlled substance by means of the Internet be predicated on a valid prescription issued by a practitioner who had conducted at least one in-person medical evaluation of the patient.  The Act was codified in Title 21 of the United States Code.

10.     Title 21, United States Code, Section 841(h) provided that it was unlawful to "knowingly or intentionally . . . writ[e] a prescription for a controlled substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of [Title 21, United States Code,] [S]ection 829(e) . . . ."

11.     Title 21, United States Code, Section 829(e)(1) provided that, "[n]o controlled substance that is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

12.     Title 21, United States Code, Section 829(e)(2)(A) provided that in order for a prescription to be valid it had to be "issued for a legitimate medical purpose in the usual course of practice by . . . (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient; or (ii) a covering practitioner."

13.     Title 21, United States Code, Section 829(e)(2)(B)(i) provided that an "in-person medical evaluation" was "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals."

14.     Title 21, United States Code, Sections 829(e)(3) and 802(54) provided that the requirement of conducting at least one in-person medical evaluation did not apply in certain circumstances involving "the practice of telemedicine" where the Secretary of Health and Human Services ("HHS") has declared "a public health emergency" and it "involve[d] patients located in such areas, and such controlled substances, as the Secretary [of HHS], with the concurrence of the Attorney General, designate[d] . . . ."  21 U.S.C. § 802(54)(D).

15.    Title 21, United States Code, Section 802(54) provided that "[t]he term 'practice of telemedicine' means, for purposes of this subchapter, the practice of medicine in accordance with applicable Federal and State laws by a practitioner (other than a pharmacist) who is at a location remote from the patient and is communicating with the patient, or health care professional who is treating the patient, using a telecommunications system referred to in [S]ection 1395m(m) of [T]itle 42 . . . ."

16.    Title 42, United States Code, Section 1395m(m)(1) and implementing regulations, including Title 42, Code of Federal Regulations, Section 410.78, provided that a telecommunications system meant "multimedia communications equipment that includes, at a minimum, audio and video equipment permitting two-way, real-time interactive communication between the patient and distant site physician or practitioner," and "include[d] store-and-forward technologies that provide for asynchronous transmission of health care information" only in "telemedicine demonstration program conducted in Alaska and Hawaii."

17.    On or about January 31, 2020, the Secretary of HHS declared a national public emergency under Title 42, United States Code, Section 247d as a result of the spread of the novel coronavirus COVID-19 within the United States.

18.    In response to the COVID-19 Public Health Emergency as declared by the Secretary, pursuant to the authority under Section 319 of the Public Health Service Act (42 U.S.C. § 247), the DEA granted temporary exceptions to the Ryan Haight Act and DEA's implementing regulations under Title 21, United States Code, Section 802(54)(D), thereby allowing the prescribing of controlled medications via telemedicine encounters—even when the prescribing practitioner had not conducted an in-person medical evaluation of the patient—in certain circumstances in order to prevent lapses in care.

19.    These emergency flexibilities to limit the spread of COVID-19 allowed, during the pendency of the COVID-19 Public Health Emergency, the prescribing of controlled substances without first conducting an in-person examination only if all of the following conditions were met:  the prescription was issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice; telemedicine communication was conducted using an audio-visual, real-time, two-way interactive communication system; and the practitioner was acting in accordance with applicable federal and state laws.

Medicare and Medicaid

20.     The Medicare program ("Medicare") was a federally funded health care program that provided benefits to persons who were at least 65 years old or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of HHS.

21.     The Medicaid program ("Medicaid") was jointly funded by the federal and state governments and was a program that provided health care benefits to certain low-income individuals and families in states.  Medicaid was administered by CMS and various state agencies.

22.     Medicare and Medicaid were each a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

23.     Individuals who received benefits under Medicare and Medicaid were referred to as "beneficiaries."

24.     Pharmacies and other health care providers, all of which provided services to beneficiaries, were able to apply for and obtain a "provider number."  A health care provider that received a provider number was able to file claims with Medicare and Medicaid to obtain reimbursement for services provided to beneficiaries.

25.     To participate in Medicare and Medicaid, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS, relevant state and federal agencies, and authorized agents and contractors.

26.     A health care provider who was assigned a provider number and provided services to beneficiaries was able to submit claims for reimbursement that included the provider number assigned to that medical provider.  Payments were often made directly to a provider of the goods or services, rather than to a beneficiary.  This payment occurred when the provider submitted the claim for payment. When a provider submitted a claim to Medicare and Medicaid, the provider certified that the contents of the

INDICTMENT                                    6

form were true, correct, and complete, and that the form was prepared in compliance with applicable laws and regulations.  The provider also certified that the items or services being billed were medically necessary and were in fact provided as billed.

27.    Medicare and Medicaid required health care providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records that documented actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare and Medicaid required complete and accurate patient medical records so that Medicare and Medicaid would be able to verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare and Medicaid, or their contractors, to review the appropriateness of payments made to the health care provider.

28.    Medicare and Medicaid paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare and Medicaid.  Medicare and Medicaid would not pay for items or services that were procured through kickbacks and bribes.

Medicare and Medicaid Prescription Drug Plans

29.    To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan.  Medicare drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors."  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

30.    Medicare's drug plans were administered by pharmacy benefit managers ("PBMs"), which adjudicated and processed payment for prescription drug claims submitted by eligible pharmacies.  PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

31.    A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Part D drug plan or with a PBM.  Pharmacies entered into contractual agreements with PBMs either directly or indirectly.  If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers.  By contracting with drug plans or PBMs,

directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state laws.

32.    Medicaid also provided coverage to its recipients for prescription drugs.  Medicaid beneficiaries could obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment or through "Medicaid Managed Care Plans," which were administered by private insurance companies that were paid by Medicaid.  A beneficiary in a Medicaid drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

33.    Upon receiving prescriptions, pharmacies submitted claims for reimbursement to Medicare, PBMs, or Medicaid for the prescription drugs dispensed to beneficiaries.  Medicare, PBMs, and Medicaid reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

34.    Pharmacies were permitted to submit claims for reimbursement to Medicare and Medicaid only for prescription drugs that were dispensed upon a valid prescription, medically necessary, and eligible for reimbursement.

35.    Medicare and Medicaid drug plans were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

Commercial Insurance Plans

36.    Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services.  Individuals who received benefits from Commercial Insurers were referred to as "members."

37.    Each of the Commercial Insurers was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b) and Title 18, United States Code, Section 220(e)(3).

38.    Commercial Insurers often made payments directly to pharmacies and other providers, rather than to members who received the health care benefits, items, and services.

39.    Commercial Insurers offered drug plans, which were administered and operated by PBMs.  A PBM acted on behalf of one or more drug plans.  Through a plan's PBM, a pharmacy could

join the plan's network.  This allowed a member of a Commercial Insurers' drug plan to fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

40.     To obtain payment for treatment or services provided to a member, pharmacies and other providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically.  The claim form required certain important information, including: the member's name and identification number; a description of the health care benefit, item, or service that was provided or supplied to the member; the billing codes for the benefit, item, or service; the date upon which the benefit, item, or service was provided or supplied to the member; and the name of the referring physician or other provider, as well as the applicable identification number for the referring physician or provider.

41.     When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with applicable laws and regulations.  The provider also certified that the items or services being billed were medically necessary and were in fact provided as billed.

The Defendants

42.     Done Global, Inc., was a Delaware corporation that was incorporated on or about February 26, 2020, and did business as "Okay Health" and "Done" ("DONE GLOBAL").  Ruthia He ("R. He") was a Founder, the President, and the Chief Executive Officer ("CEO") of DONE GLOBAL. R. He owned a majority and controlling equity interest in DONE GLOBAL. DONE GLOBAL's principal place of business was within the Northern District of California.

43.     DONE GLOBAL identified itself as a "digital health company," which operated on a subscription-based model where individuals ("Done members") paid a monthly fee to DONE GLOBAL. DONE GLOBAL advertised that it provided online diagnosis, treatment, and refills of medication for attention deficit hyperactivity disorder ("ADHD").  Since the beginning of the COVID-19 pandemic, DONE GLOBAL arranged for the prescription of over 40 million pills of Adderall and other stimulants and obtained over $100 million in revenue.

44.     MINDFUL MENTAL WELLNESS, P.A. ("MMW FLORIDA"), was a Florida corporation incorporated by DONE GLOBAL in 2023.  MMW FLORIDA replaced Done Health P.C.

("Done Health") as the physician-owned business affiliated with DONE GLOBAL after pharmacies ceased filling prescriptions issued by Done Health.  MMW FLORIDA was nominally owned by Individual 1, a doctor that R. He had retained.  R. He selected Individual 1 to be the nominal owner of MMW FLORIDA because Individual 1 was licensed in all 50 states.  Despite Individual 1's nominal ownership of MMW FLORIDA, in truth, R. He maintained beneficial ownership and control over MMW FLORIDA.

Other Individuals and Entities

45.    R. He was a resident, at various times, of the Northern District of California.

46.    David Brody ("Brody") was a resident of the Northern District of California.  Brody was a psychiatrist who maintained a DEA registration number and was authorized to prescribe controlled substances in the State of California.

47.    Individual 1 was a resident of Indiana and a medical doctor licensed in all 50 states.  Individual 1 was a family physician.  Individual 1 had only general training in psychiatry and ADHD as part of his family medicine training and residency.

48.    Done Health was a California medical professional corporation that was incorporated on or about August 7, 2020.  In or about August 2020, Brody was identified as the sole incorporator of Done Health.  In truth, R. He owned, controlled, and operated Done Health.

49.    DONE GLOBAL, through Done Health and MMW FLORIDA, retained and maintained a network of medical professionals ("Done Prescribers") that included doctors and nurse practitioners.  DONE GLOBAL, through Done Health and MMW FLORIDA, paid the Done Prescribers to diagnose Done members with ADHD and to write prescriptions for controlled substances, including Adderall and other stimulants.  Done Prescribers included Brody, Katrina Pratcher, Erin Kim, Elizabeth Shapard, Ginger Simor, and others.

50.    The following individuals, identified by initials but known to the Grand Jury, among others, were Done members and were prescribed Adderall and other stimulants by Done Prescribers, and received those controlled substances pursuant to prescriptions written by Done Prescribers: H.B.; T.T.; V.S.; and N.C.

51.    Certain pharmacies operating in the United States were authorized to distribute controlled

substances, and distributed Adderall and other stimulants to Done members based on prescriptions

submitted to these pharmacies by Done Prescribers acting on behalf of and in conjunction with DONE

GLOBAL, Done Health, and MMW FLORIDA.  Pursuant to their corresponding responsibility, the

pharmacies adopted policies to ensure that controlled substance prescriptions were issued for a

legitimate medical purpose in the usual course of professional practice, and that pharmacists were acting

in the usual course of professional practice in filling such prescriptions.  21 C.F.R. §§ 1306.04(a) and

1306.06.  In order to exercise their corresponding responsibility, the pharmacies that filled prescriptions

from Done Prescribers employed pharmacists who reviewed relevant information about the prescription,

including documentation and evidence provided by the Done Prescriber or others regarding whether the

prescription was issued for a legitimate medical purpose in the usual course of professional practice.

Certain pharmacies, in the ordinary course, relied on information transmitted by the Done Prescriber or

others acting on the Done Prescriber's behalf.

COUNT ONE: (21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances)

52.    Paragraphs 1 to 51 of this Indictment are realleged and incorporated by reference as

though fully set forth herein.

53.    From in or around March 2020, and continuing through in or around February 2025, in

San Francisco, in the Northern District of California, and elsewhere, the defendants,

DONE GLOBAL and MMW FLORIDA,

did knowingly and intentionally combine, conspire, confederate, and agree together, and with R. He,

Brody, Done Health, and other persons known and unknown to the Grand Jury, to knowingly and

intentionally distribute and dispense mixtures and substances containing a detectable amount of

controlled substances, including amphetamine-dextroamphetamine and other stimulants, Schedule II

controlled substances, not for a legitimate medical purpose in the usual course of professional practice,

in violation of Title 21, United States Code, Section 846.

Purpose of the Conspiracy

54.    It was the purpose of the conspiracy for DONE GLOBAL, MMW FLORIDA, Done

Health, R. He, David Brody, and others to unlawfully enrich themselves by: (a) conspiring to provide

Done members with prescriptions for Adderall and other stimulants that were not issued for a legitimate

medical purpose in the usual course of professional practice; (b) enabling Done members to obtain Adderall and other stimulants from pharmacies by defrauding pharmacies and Medicare, Medicaid, and the Commercial Insurers; (c) concealing and disguising the unlawful prescription of Adderall and other stimulants, the submission of false and fraudulent claims to Medicare, Medicaid, and the Commercial Insurers, and the receipt and transfer of the proceeds of the conspiracy; and (d) increasing revenue and causing the value of DONE GLOBAL to increase through the illegal distribution of controlled substances to Done members who paid subscription fees on a monthly basis in exchange for Adderall and other stimulants.

Manner and Means of the Conspiracy

55.    The manner and means by which DONE GLOBAL, MMW FLORIDA, Done Health, R. He, David Brody, and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

56.    R. He initially owned, controlled, and operated DONE GLOBAL in violation of California's corporate practice of medicine law, and R. He, Brody, and others concealed and disguised the scheme by creating Done Health to create the false appearance that it was an independent company in compliance with California law.

57.    R. He made false and fraudulent representations that DONE GLOBAL was a successful business prior to the COVID-19 pandemic, when, in fact, DONE GLOBAL did not generate material revenue until R. He, Brody, and others exploited emergency flexibilities during the public health emergency to provide easy access to Adderall and other stimulants that were not issued for a legitimate medical purpose in the usual course of professional practice, including those provided to H.B., T.T., V.S., N.C., and others.

58.    R. He and others caused DONE GLOBAL, through Done Health, to acquire thousands of Done members by, among other things, spending tens of millions of dollars on deceptive social media advertisements, intentionally targeting drug-seeking patients, and advertising that members could obtain easy access to prescriptions for Adderall and other stimulants in exchange for payment of a monthly subscription fee.

59.    Done Prescribers, retained by DONE GLOBAL through Done Health and MMW

FLORIDA, were, at times, willing to prescribe Adderall and other stimulants to Done members not for a legitimate medical purpose in the usual course of professional practice.  The Done Prescribers included Brody, Erin Kim, Katrina Pratcher, Elizabeth Shapard, Ginger Simor, and others.

60.     R. He, Brody, Done Health, MMW FLORIDA, and others acting on behalf of DONE GLOBAL obtained confidential patient information for thousands of Done members and provided it to Done Prescribers in order for Done Prescribers to write prescriptions for Adderall and other stimulants.

61.     R. He, and others made false statements and material omissions that DONE GLOBAL, through Done Health and MMW FLORIDA, was able to accurately diagnose ADHD in shorter appointment times than other medical clinics because its intake process purportedly screened out individuals who were unlikely to have ADHD, when in fact individuals who were unlikely to have ADHD were not prevented from scheduling an appointment.

62.     R. He, Brody, and others established policies for initial telemedicine encounters— including limiting the information available to Done Prescribers, instructing Done Prescribers to prescribe Adderall and other stimulants even if the Done member did not need the drug for a legitimate medical purpose, and refusing to compensate Done Prescribers for initial encounters over 30 minutes— thereby causing Done Prescribers, including Prescriber 1 and Prescriber 2, to write prescriptions that were not for a legitimate medical purpose in the usual course of professional practice.

63.     In order to maximize profits, R. He, Brody, Done Health, MMW FLORIDA, and others on behalf of DONE GLOBAL agreed with Done Prescribers, including Brody, Kim, Pratcher, Shapard, and others acting on behalf of DONE GLOBAL and MMW FLORIDA, that after an initial consultation with a Done member, the Done Prescribers would be paid solely based on "patient load" (the number of patients to whom the Done Prescribers wrote prescriptions each month) and would not be paid for any patient consultation, time, or medical services that the Done Prescribers provided to Done members. The purpose, as R. He wrote, was to "use the comp structure to dis-encourage follow-up" and, as a result, co-conspirator Done Prescribers were able to obtain lucrative pay for minimal work, sometimes hundreds of thousands of dollars a year in exchange for writing prescriptions for Adderall and other stimulants without much, if any, in-person or audio-visual telemedicine consultation with the Done members.

64.     R. He, Brody, Done Health, MMW FLORIDA, and others acting on behalf of DONE GLOBAL caused Done Prescribers to write prescriptions that were not for a legitimate medical purpose in the usual course of professional practice through the use of a purported "bridge prescription" policy that transferred Done members to Done Prescribers who never had a prior in-person examination or audio-visual telemedicine consultation with the Done member, and having Done Prescribers write prescriptions for Adderall and other stimulants without having an in-person examination or audio-visual telemedicine consultation with these transferred Done members.

65.     R. He, Brody, Done Health, MMW FLORIDA, and others acting on behalf of DONE GLOBAL also conspired to defraud certain pharmacies and Medicare, Medicaid, and the Commercial Insurers in order to cause: (a) the pharmacies to dispense Adderall and other stimulants to Done members in violation of their corresponding responsibility; (b) Medicare, Medicaid, and the Commercial Insurers to pay for the cost of these drugs; and (c) Done members to pay subscription fees for the benefit of DONE GLOBAL and MMW FLORIDA.

66.     R. He, Brody, Done Health, MMW FLORIDA, and others acting on behalf of DONE GLOBAL, among other things:

a)     collected and caused to be collected Medicare, Medicaid, and Commercial Insurers' insurance information from Done members;

b)     submitted and caused to be submitted false and fraudulent prior authorizations to Medicare, Medicaid, and Commercial Insurers;

c)     caused Done members' insurance information to be transmitted to pharmacies;

d)     made or caused to be made false and fraudulent representations to certain pharmacies about DONE GLOBAL and MMW FLORIDA prescription practices, policies, and other material facts in order to deceive pharmacies and obstruct, interfere with, and deprive pharmacies of their ability to exercise their corresponding responsibility, and cause the pharmacies to submit false and fraudulent claims to Medicare, Medicaid, and Commercial Insurers; and

e)     created and caused to be created false and fraudulent documents, including patient records.

67.    In the course of their work for DONE GLOBAL, Done Health, and MMW FLORIDA, and for the benefit of themselves and the other co-conspirators, the Done Prescribers, including Brody, Kim, Pratcher, Shapard, Simor, and others, ordered Adderall and other stimulants for Done members, including Medicare and Medicaid beneficiaries and Commercial Insurer members, with whom they lacked a pre-existing practitioner-patient relationship, without an examination, and sometimes based solely on a short video or audio communication and limited patient intake documents, or without any video or audio communication at all.  The Done Prescribers, including Brody, Kim, Pratcher, Shapard, Simor, and others, agreed with DONE GLOBAL, Done Health, and MMW FLORIDA and others to provide few, if any, medical treatment options besides prescribing Adderall and other stimulants.

68.    Done Prescribers, including Brody, Kim, Pratcher, Shapard, and others, ordered Adderall and other stimulants for Done members knowing that the prescriptions were not prescribed for a legitimate medical purpose in the usual course of professional practice. For example, in some cases, Done members: (a) did not meet the Diagnostic and Statistical Manual of Mental Disorders (DSM)-V criteria for diagnosing ADHD; (b) posed a risk of diversion; and (c) in the event such medications were necessary, were provided dosages, directions, combinations, or quantities of medications beyond any legitimate medical purpose, and without following the usual course of professional practice for prescribing them.

69.    After an initial consultation with a Done member, Done Prescribers, including Brody, Kim, Pratcher, Shapard, and others, signed additional monthly prescriptions for Schedule II controlled substances, including Adderall and other stimulants, that were not for a legitimate medical purpose in the usual course of professional practice for Done members, including Medicare and Medicaid beneficiaries and Commercial Insurer members.  They did this by, among other things, prescribing (a) without an in-person examination and without seeing, speaking to, and/or otherwise engaging in audio or video communication with Done members; and (b) without determining the Done members' medical need for the prescriptions.  In some instances, the Done Prescribers were paid to write prescriptions for Done members who the Done Prescribers had never seen or had any prior telemedicine consultation with, including for Done members in states where the Done Prescriber was not licensed to write controlled substance prescriptions under state and federal law.

70.     In the course of their work with DONE GLOBAL, Done Health, and MMW FLORIDA, Done Prescribers, including Brody, Kim, Shapard, Simor, and others, signed monthly prescriptions for Done members, including Medicare and Medicaid beneficiaries and Commercial Insurer members, for Adderall and other stimulants, referred to them knowing that they were (a) not for a legitimate medical purpose in the usual course of professional practice, and (b) medically unnecessary.

71.     In 2023, DONE GLOBAL incorporated MMW FLORIDA and the two entities entered into an agreement essentially replacing Done Health as DONE GLOBAL's physician-owned business. This enabled DONE GLOBAL to continue the conspiracy.  Specifically, certain pharmacies refused to fill prescriptions written by Done Prescribers.  DONE GLOBAL, at the direction of R. He, used MMW FLORIDA as a "reskin" of Done Health in order to circumvent the pharmacies that had blocked the filling of Done-affiliated prescriptions.

72.     In or around early 2024, the Done Prescribers that had previously been retained by Done Health to provide clinical services to Done members were switched from Done Health to MMW FLORIDA.  This included Shapard and others.  Beginning at least in March 2024, DONE GLOBAL's operational personnel, on behalf of DONE GLOBAL, began to misrepresent to pharmacies that the Done Prescribers were not affiliated with DONE GLOBAL or Done Health.  DONE GLOBAL retained control over all medical billing and claims services, bookkeeping, banking, and financial services for MMW FLORIDA.

73.     R. He, Brody, Done Health MMW FLORIDA, and their co-conspirators, on behalf of DONE GLOBAL, persisted in the unlawful practices described herein after being made aware that: (a) Done members were reading material posted on online social networks about how to use DONE to obtain easy access to Adderall and other stimulants; (b) Done members had overdosed and died; (c) Done members described the company as a "straight up pill mill" and a "drug-pushing scam to sell ADHD drugs and make a lot of f****** money;" (d) national media outlets reported that the company made Adderall and other stimulants too easy to obtain; and (e) another company that prescribed Adderall and other stimulants via telemedicine ("Telehealth Company 1") ceased prescribing Adderall and other stimulants on the same day that it was publicly reported that a Grand Jury issued a subpoena to Telehealth Company 1.

74.     R. He, Brody, Done Health, and their co-conspirators, on behalf of DONE GLOBAL and MMW FLORIDA, concealed and disguised the conspiracy by making false and fraudulent representations to other third parties, including media outlets, business partners, and regulatory and credentialing entities.  These false and fraudulent representations concerned the company's business model and its policies, procedures, and practices distributing Adderall and other stimulants.  The purpose of these false and fraudulent representations was to maintain or increase the value of DONE GLOBAL and MMW FLORIDA, induce third parties to do business with DONE GLOBAL and MMW FLORIDA, and forestall, impede, or obstruct government investigations and regulatory action against R. He, Brody, DONE GLOBAL, MMW FLORIDA, and others.

75.     R. He, Brody, and their co-conspirators, on behalf of DONE GLOBAL, sought to conceal and disguise the conspiracy, and obstruct justice, by: (a) corruptly altering, destroying, and concealing records and documents; (b) refraining from using company email and messaging platforms; (c) using encrypted messaging platforms, personal email accounts, and personal devices to communicate about company business, all with the intent to impair the communications and documents for use in the government and Grand Jury's investigation; and (d) causing DONE not to produce records in response to a Grand Jury subpoena.

All in violation of 21 U.S.C. § 846.

COUNTS TWO THROUGH FIVE:            (21 U.S.C. § 841(a) and (b)(1)(C) and 18 U.S.C. § 2 –
                                    Distribution of Controlled Substances and Aiding and
                                    Abetting)

76.     Paragraphs 1 through 51 and 54 through 75 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

77.     On or about each of the dates set forth below, in the Northern District of California, and elsewhere, the defendant,

DONE GLOBAL,

did knowingly and intentionally distribute and dispense, and aid or abet in the distribution and dispensing of, mixtures and substances containing a detectable amount of the listed Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice:

| Count | Done Member | Done Prescriber | Approx. Date of Prescription | Controlled Substance |
|-------|-------------|-----------------|------------------------------|----------------------|
| TWO | H.B. | Prescriber 1 | Oct. 14, 2020 | Mixed Amphetamine Salts ER 20 mg. capsule |
| THREE | T.T. | Brody | July 27, 2022 | Dextroamphetamine-Amphetamine ER 10 mg. capsule |
| FOUR | V.S. | Brody | June 18, 2021 | Amphetamine Salt Combo 30 mg. tablet |
| FIVE | N.C. | Shapard | Oct. 7, 2022 | Amphetamine Salt Combo 20 mg. tablet |

Each in violation of 21 U.S.C. § 841(a) and (b)(1)(C) and 18 U.S.C. § 2.

COUNT SIX: (18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud)

78.     Paragraphs 1 through 51 and 54 through 75 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

79.     From in or around March 2020, and continuing through in or around February 2025, in the Northern District of California, and elsewhere, the defendant,

DONE GLOBAL,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with R. He, Brody, Done Health, and others known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, and Commercial Insurers.

Purpose of the Conspiracy

80.     The allegations in Paragraph 54 are realleged and incorporated as if fully set forth here.

Manner and Means of the Conspiracy

81.     The allegations in Paragraphs 55 through 75 are realleged and incorporated as if fully set forth here.

82.     In the course of their work for DONE GLOBAL and Done Health, Done Prescribers, including Brody, Shapard, and others, knew and intended that Done members would use health care benefits, including those provided by Medicare and Medicaid, to pay pharmacies for the cost of the Adderall and other stimulants.  Done Prescribers, including Brody, Shapard, and others, submitted and

caused to be submitted false and fraudulent prior authorizations to Medicare, Medicaid, and other insurers in order to obtain insurance coverage for the dispensing of Adderall and other stimulants by pharmacies to Done members.

83. In the course of their work for DONE GLOBAL and Done Health, Done Prescribers, including Brody, Shapard and others, caused the submission of false and fraudulent claims to Medicare, Medicaid, and Commercial Insurers, for which Medicare, Medicaid, and the Commercial Insurers paid in excess of approximately $14 million.

All in violation of 18 U.S.C. § 1349.

COUNT SEVEN: (18 U.S.C. § 1512(k) – Conspiracy to Obstruct Justice)

84. Paragraphs 1 through 51, 54 through 75, and 82 through 83 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

85. Beginning in or around 2022, and continuing through in or around November 2025, within the Northern District of California, and elsewhere, the defendant,

DONE GLOBAL,

did knowingly and willfully combine, conspire, confederate, and agree with R. He, Done Health, and with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1512(c), that is, to corruptly: (a) alter, destroy, mutilate, and conceal a record, document, and other object, and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding; and (b) otherwise obstruct, influence, and impede any official proceeding, and attempt to do so.

86. On or about September 2022, during a Grand Jury investigation, a Grand Jury for the Northern District of California issued a subpoena to the Custodian of Records for DONE GLOBAL and its affiliated entities.  The Grand Jury subpoena sought the production of records, including, among others: (a) communications between and among employees of Done Health, or between and among employees of Done Health and medical providers regarding telehealth visits, diagnoses, prescriptions, Adderall, and prescribing practices; (b) internal standard operating procedures, policies, training materials, or other guidance provided to employees and medical providers; and (c) documents that related to the news media coverage of Done Health.

87.    After receiving the Grand Jury subpoena, R. He, and others acting for DONE GLOBAL, and Done Health, altered, destroyed, and concealed records, documents, and communications from the Grand Jury, including by: (a) deleting and causing the deletion of documents and communications; (b) refraining from using company email and messaging platforms; (c) using encrypted messaging platforms, personal email accounts, and personal devices to communicate about company business; and (d) causing documents not to be provided to the Grand Jury.

All in violation of 18 U.S.C. § 1512(k).

FORFEITURE ALLEGATION:        (18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461)

88.    The factual allegations contained in this Indictment are hereby realleged and fully incorporated herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461.

89.    As a result of a conviction for any of the offenses alleged in Counts One through Five of this Indictment, the defendants,

DONE GLOBAL and MMW FLORIDA,

shall forfeit to the United States, pursuant to 21 U.S.C. § 853(a), any property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the violation and any property used or intended to be used in any manner or part to commit or to facilitate the commission of such violation, and including but not limited to a forfeiture money judgment and a fine of twice the gross profits and other proceeds.

90.    As a result of a conviction for any offense alleged in Count Six of this Indictment, the defendant,

DONE GLOBAL,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c), all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to a forfeiture money judgment equal to the gross

proceeds obtained as a result of the offense.

91.    As a result of a conviction for any offense alleged in Count Seven of this Indictment, the defendant

DONE GLOBAL,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to a forfeiture money judgment.

92.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to 18 U.S.C. §§ 981, 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461, and Federal Rule of Criminal Procedure 32.2.

DATED: December 16, 2025                          A TRUE BILL.


                                                     _____/s/_____
                                                     FOREPERSON

CRAIG H. MISSAKIAN
United States Attorney

_____
        /s/
KRISTINA GREEN
LLOYD FARNHAM
Assistant United States Attorney
U.S. Attorney's Office for the
Northern District of California


LORINDA I. LARYEA
Acting Chief, Fraud Section
U.S. Department of Justice

_____
        /s/
JACOB FOSTER
Acting Chief, Health Care Fraud Unit
JIL SIMON
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

INDICTMENT                    22